# IN THE COURT OF APPEALS
## OF THE
## STATE OF MISSISSIPPI
### NO. 1999-CA-01857-COA

**LIBERTY MUTUAL INSURANCE COMPANY**                                    **APPELLANT**

**v.**

**JAMES MCKNEELY**                                                       **APPELLEE**

| | |
|---|---|
| DATE OF JUDGMENT: | 08/31/1999 |
| TRIAL JUDGE: | HON. FRANK G. VOLLOR |
| COURT FROM WHICH APPEALED: | WARREN COUNTY CIRCUIT COURT |
| ATTORNEY FOR APPELLANT: | LAWRENCE D. WADE |
| ATTORNEY FOR APPELLEE: | PAUL KELLY LOYACONO |
| NATURE OF THE CASE: | CIVIL - INSURANCE |
| TRIAL COURT DISPOSITION: | APPELLEE AWARDED $150,000 COMPENSATORY DAMAGES AND $200,000 PUNITIVE DAMAGES |
| DISPOSITION: | AFFIRMED - 04/17/2001 |
| MOTION FOR REHEARING FILED: | 5/1/2001; denied 6/19/2001 |
| CERTIORARI FILED: | 6/29/2001; granted 6/6/2002 |
| MANDATE ISSUED: | |

EN BANC.

LEE, J., FOR THE COURT:

¶1. Pursuant to a bad faith complaint filed by James McKneely against Liberty Mutual Insurance Company, the trial judge sitting without a jury, entered a final judgment in favor of McKneely in the total sum of $150,000 in compensatory damages and $200,000 in punitive damages. Feeling aggrieved by this verdict, Liberty Mutual has filed a timely appeal and presents the following issues as error: (1) whether there was sufficient evidence presented for the trial court to deny a directed verdict regarding actual and punitive damages, and (2) whether the verdicts rendered in favor of McKneely for actual and punitive damages were against the overwhelming weight of the evidence. Finding these issues without merit, we affirm the holdings of the trial judge regarding the award of actual and punitive damages.

## FACTS

¶2. On March 30, 1994, McKneely sustained an on-the-job injury to his back while he was pulling lumber for his employer, Anderson Tully Company. Liberty Mutual was the workers' compensation insurance carrier for Anderson Tully at the time of McKneely's injury. At the time of injury, Liberty Mutual conceded that McKneely had a work-related injury and began paying temporary total disability benefits. The payment of these benefits continued until McKneely returned to work at Anderson Tully on June 13, 1994.

¶3. Upon McKneely's return to work he testified he was only able to work for approximately eight or nine

days. McKneely informed his supervisor he was unable to continue performing his duties. McKneely testified that at this time his pain had increased. On July 5, 1994, McKneely once again started receiving workers' compensation benefits from Liberty Mutual. In December of 1994 workers' compensation benefits were terminated by Liberty Mutual. On January 9, 1995, McKneely filed a motion for an emergency hearing at the Workers' Compensation Commission regarding the termination of his temporary benefits.

¶4. In this motion, McKneely alleged that at the time Liberty Mutual terminated his temporary total benefits he had been referred by Dr. Weatherly, his treating physician, to Dr. Hensarling. Additionally, he asserted that Dr. Hensarling was treating him at the time his benefits ceased and had not released him to return to work. McKneely was granted those benefits by the administrative law judge on August 9, 1996. This order was later affirmed by the Worker's Compensation Commission. Subsequently, Liberty Mutual sought termination of temporary total disability benefits. On December 31, 1998, an administrative law judge determined that McKneely reached maximum medical improvement on October 22, 1998, and benefits for temporary and permanent disability, as well as payment of necessary medical services and supplies were awarded. During this sequence of events, on August 15, 1996, McKneely filed a complaint alleging bad faith by Liberty Mutual for its denial of his benefits and medical treatment. This opinion focuses on the merits of the bad faith complaint.

¶5. McKneely asserted in his complaint for bad faith against Liberty Mutual that it had intentionally violated its duty to pay his compensation benefits and medical expenses. As a result of Liberty Mutual's denial of benefits McKneely claimed that he was unable to meet his household bills and had suffered great emotional and mental distress over his lack of income and medical treatment. Liberty Mutual answered the complaint and stated that they had acted in good faith and had an arguable basis for denying the benefits.

¶6. Although McKneely was examined and treated by numerous doctors, he initially received primary treatment for his on-the-job injury from Dr. Wallace Weatherly. Dr. Weatherly's treatment is of significance in this case because the testimony at trial revealed that Liberty Mutual and its counsel relied primarily on Dr. Weatherly's November 30, 1994, letter when they decided to terminate the temporary total disability benefits in December of 1994. More specific facts surrounding the denial of McKneely's temporary total disability benefits and his denial of medical treatment will be addressed in this Court's discussion of the issues.

## STANDARD OF REVIEW

¶7. The standard of review regarding the sufficiency of the evidence for motions for directed verdicts, peremptory instructions, and motions for judgment notwithstanding the verdict (J.N.O.V.) is as follows:

> [T]his court will consider the evidence in the light most favorable to the appellee, giving that party the benefit of all favorable inference that may be reasonably drawn from the evidence. If the facts so considered point so overwhelmingly in favor of the appellant that reasonable men could not have arrived at a contrary verdict, we are required to reverse and render. On the other hand if there is substantial evidence in support of the verdict, that is, evidence of such quality and weight that reasonable and fair minded jurors in the exercise of impartial judgment might have reached different conclusions, affirmance is required. The above standards of review, however, are predicated on the fact that the trial judge applied the correct law.

*Steele v. Inn of Vicksburg*, 697 So. 2d 373, 376 (Miss. 1997).

¶8. "'A circuit court judge sitting without a jury is accorded the same deference with regard to his findings as a chancellor,' and his findings are safe on appeal where they are supported by substantial, credible, and reasonable evidence." *Maldonado v. Kelly*, 768 So. 2d 906, 908 (¶4) (Miss. 2000) (citing *City of Jackson v. Perry*, 764 So. 2d 373, 376 (Miss. 2000) (citing *Puckett v. Stuckey*, 633 So. 2d 978, 982 (Miss. 1993)). In this instance, those findings of fact will not be set aside on appeal unless manifestly wrong. *Elmore v. Vital Care of Columbus, Ltd.*, 755 So. 2d 548, 549 (¶7) (Miss. Ct. App. 2000); *see also Cotton v. McConnell*, 435 So. 2d 683, 685 (Miss. 1983).

¶9. When reviewing a motion for a new trial, we look at the weight of the evidence. "The Supreme Court will reverse the lower court's denial of a motion for a new trial only if, by doing so, the court abused its discretion. We will not order a new trial unless convinced that the verdict is so contrary to the overwhelming weight of the evidence that, to allow it to stand, would be to sanction an unconscionable injustice." *Whitten v. Cox*, 1998-CA-01410-SCT (¶26) (Miss. July 27, 2000) (citations omitted). Additionally, the trial judge has sole authority to determine the credibility of a witness when sitting as the trier of fact in a bench trial. *Rice Researchers, Inc. v. Hiter*, 512 So. 2d 1259, 1265 (Miss. 1987).

## DISCUSSION

### I. WHETHER THERE WAS SUFFICIENT EVIDENCE PRESENTED FOR THE TRIAL COURT TO DENY A DIRECTED VERDICT REGARDING ACTUAL AND PUNITIVE DAMAGES.

### AND

### II. WHETHER THE VERDICTS RENDERED IN FAVOR OF MCKNEELY FOR ACTUAL AND PUNITIVE DAMAGES WERE AGAINST THE OVERWHELMING WEIGHT OF THE EVIDENCE.

¶10. Liberty Mutual has presented four issues for our review. For the sake of clarity we have consolidated these issues into two, and will address each in conjunction with the other. Liberty Mutual argues that under Mississippi law, an insurer such as Liberty Mutual is not liable to McKneely for actual and punitive damages if it has an arguable reason to deny workers' compensation benefits. McKneely, on the other hand, asserts that as an insurance carrier, Liberty Mutual, breached its duty to provide workers' compensation benefits and failed to promptly and adequately investigate his claim before denying those benefits. *See Murphree v. Federal Ins. Co.*, 707 So. 2d 523, 531 (Miss. 1997).

¶11. The exclusivity provision of Miss. Code Ann. § 71-3-9 (Rev. 2000) of the Workers' Compensation Act does not bar a claim by the employee against the employer's insurance carrier for the commission of an intentional tort. *Southern Farm Bureau Cas. Ins. v. Holland*, 469 So. 2d 55, 59 (Miss. 1984). The Mississippi Supreme Court has classified the bad faith refusal to pay workers' compensation benefits as an intentional tort. *Id*. Having established that McKneely was entitled to pursue his complaint for bad faith, we now must review the application of the two-tiered test used by the trial judge in deciding whether actual and punitive damages were properly given to McKneely.

¶12. In the case at bar, the trial judge sat without a jury and was required to employ a two-tiered test to determine whether McKneely was entitled to actual and punitive damages. *Moeller v. American Guar.*

*and Liability*, 707 So. 2d 1062, 1072 (Miss. 1996). The first tier required the trial judge to determine whether the asserted wrongdoing was so flagrant that punitive damages should even be considered. *Id*. If the trial judge determines that the questioned conduct is of a serious nature it must be addressed to the fact-finder. *Id*. As aforementioned, in this instance, no jury was present and the trial judge served as the finder of fact. Therefore, the trial judge had to address the second tier and determine if the events occurred and make a correct allocation of money, if any, to deter like conduct. *Id*.; *see also Andrew Jackson Life Ins. Co. v. Williams*, 566 So. 2d 1172, 1182 (Miss. 1996). McKneely carried the burden of proof and was required to present evidence by a preponderance of the evidence that met both tiers of the test. *Moeller v. American Guar. and Liability*, 707 So. 2d 1062, 1073 (Miss. 1996).

¶13. In the case at bar, the alleged wrongdoing is Liberty Mutual's wrongful termination and denial of the payment of temporary total disability benefits and medical treatment. Therefore, when the trial judge determines whether the alleged wrongdoing justifies an award of punitive damages he must determine whether McKneely proved that the insurer lacked a legitimate or an arguable reason for failing to pay his claim. *Moeller v. American Guar. and Liability*, 707 So. 2d 1062, 1072 (Miss. 1996). If a legitimate or arguable reason exists punitive damages will generally not lie. *Id*. To merit the determination that the denial of claims is arguably-based the finder of fact must hold that the denial resulted after dealing with the disputed claim fairly and with good faith. *Id*. McKneely must show by a preponderance of the evidence that there was some willful or malicious wrong, gross negligence, or reckless disregard for his rights. *Id*. at 1072-73.

¶14. Liberty Mutual primarily bases the assertion of an arguable basis for the denial of McKneely's benefits on a November 30, 1994, letter from Dr. Wallace Weatherly, a treating physician for McKneely. The November 30, 1994, letter was in response to Nurse Jackie Moore's letter who worked as a Rehabilitation Consultant Nurse for Liberty Mutual. Dr. Weatherly's letter read as follows:

> Dear Jackie:
>
> Re: James McKneely
>
> This is in regard to your later [sic] dated October 28, 1994, regarding James McKneely.
>
> Mr. McKneely's current diagnosis, as far as I am concerned, is neck pain of unknown etiology. Mr. McKneely had been labeled with the diagnosis of fibromyalgia by Dr. Hensarling.
>
> Mr. McKneely is to follow up with Dr. Hensarling, as I have referred him to Dr. Hensarling.
>
> I do not feel that Mr. McKneely's current problem is related to his injury which was sustained after pulling heavy lumber. I, in no way, see a relationship between fibromyalgia and pulling of lumber.
>
> Mr. McKneely will be treated by Dr. Hensarling but I suspect he will need some sort of work hardening program. He will need some psychiatric counselling to see if there is something going on that might be psychosomatic, as I cannot find anything organic wrong with him at this time.
>
> As far as I am concerned, Mr. McKneely has reached maximum medical improved [sic] as far as any obvious organic musculoskeletal problem, but the inorganic problems may exist. Dr. Hensarling is to complete the workup so I will leave this statement for him to answer.

¶15. Liberty Mutual argues that pursuant to the advice of counsel, the following statements contained in Dr. Weatherly's letter were initially relied on by Liberty Mutual for the denial of McKneely's benefits:

> Mr. McKneely's current diagnosis, as far as I am concerned, is neck pain of unknown etiology. . . I do not feel that Mr. McKneely's current problem is related to his injury which was sustained after pulling heavy lumber. I, in no way, see a relationship between fibromyalgia and pulling of lumber. . . I cannot find anything organic wrong with him at this time. As far as I am concerned, Mr. McKneely has reached maximum medical improved [sic] as far as any obvious organic musculoskeletal problem, but the inorganic problems may exist. . . .

¶16. As argued by McKneely, the law in Mississippi places a duty on an insurance company to *promptly* and *adequately* investigate all of the relevant facts involved in an insured's claim. *Szumigala v. Nationwide Ins. Co.*, 853 F.2d 274, 280 (5th Cir. 1988); *see also Bankers Life & Cas. Co. v. Crenshaw*, 483 So. 2d 254, 276 (Miss. 1985). In order for McKneely to meet his burden in proving a bad faith claim he must show that the level of negligence was such that if a proper investigation had been conducted, it would easily reveal evidence that demonstrated that Liberty Mutual's defenses are without merit. *Murphree v. Federal Ins. Co.*, 707 So. 2d 523, 531 (Miss. 1997). Through testimony presented at trial, McKneely established that "promptly" and "adequately" are two words which were totally ignored by Liberty Mutual.

¶17. Liberty Mutual defends its position of an arguable basis and lack of investigation on several points. Liberty Mutual asserted that while fibromyalgia may have been mentioned in Dr. Weatherly's letter, there was no cause stated. During the trial of this matter, one counsel for Liberty Mutual espoused the view that it was not their duty to prove McKneely's case for him regarding the cause of his injury. However, we note that trial counsel has confused his stance with the insurer's duty to investigate as enumerated in cases such as *Szumigala v. Nationwide Ins. Co.*, 853 F.2d 274, 280 (5th Cir. 1988); *see also Bankers Life & Cas. Co. v. Crenshaw*, 483 So. 2d 254, 276 (Miss. 1985). There was additional testimony that McKneely's denial of benefits was a result of little consideration of his actual case.

¶18. Testimony from Donald Burch, another of Liberty Mutual's counsel in this case, revealed that the denial occurred as a result of a conversation between him and Ed Knollmeyer, claims supervisor for Liberty Mutual and was primarily based on the aforementioned select statements in Dr. Weatherly's letter. Burch went on to comment that while they relied on certain phrases in Dr. Weatherly's letter to deny benefits he also relied on his past experience with workers' compensation claims. Burch testified that he had handled fibromyalgia cases before, and that in his experience this was the first fibromyalgia case that he had seen the Workers' Compensation Commission pay.

¶19. To further support its argument, Liberty Mutual asserts that "it has been held that bad faith cases are not proper when a physician has given evidence supporting the denial of benefits." (citing *Sherrod v. United States Fidelity and Guar. Co.*, 518 So. 2d 640, 645 (Miss. 1987); *Peel v. American Fidelity Assur. Co.*, 680 F.2d 374, 376-77 (5th Cir. 1982); *Horton v. Hartford Life Ins. Co.*, 570 F. Supp. 1120, 1123-24 (N. D. Miss. 1983)). However, Liberty Mutual has misinterpreted these cases with this blanket statement. The aforementioned cases merely once again state that if an insurance carrier has an arguable basis for denying a claim punitive damages do not lie. This arguable basis may lie in a physician's testimony. However, in the aforementioned cases, unlike in the case at bar, at the time of the denial of benefits there was conflicting medical testimony and the insurance carrier conducted a prompt investigation to confirm or deny the contradictions in the physicians' medical opinions. In the case sub judice, we did not

have conflicting medical reports at the time of McKneely's denial of benefits. To the contrary, we had the November 30, 1994, letter from Dr. Weatherly regarding musculoskeletal problems, and while Dr. Weatherly was of the opinion that McKneely had reached maximum medical improvement regarding obvious organic musculoskeletal problems, he espoused no opinion regarding inorganic problems. Instead, he had referred McKneely to Dr. Hensarling. Dr. Hensarling was to give an opinion on inorganic problems. In fact, in Dr. Weatherly's November 30, 1994, letter he states "Dr. Hensarling is to complete the workup so I leave this statement for him to answer."

¶20. The record further discloses that at the time of McKneely's denial of benefits there existed an October 24, 1994, letter from Dr. Hensarling to Dr. Weatherly. Dr. Hensarling was the rheumatologist whom Dr. Weatherly deferred to in his November 30, 1994, letter regarding possible inorganic problems. The letter from Dr. Hensarling revealed that he diagnosed McKneely with a "florid case of fibromyalgia." However, Dr. Hensarling went on to state that "[his] workup ha[d] been limited by workman's comp . . . ." Testimony at trial did not disclose that this letter was considered by Liberty Mutual or its counsel at the time of the denial of benefits.

¶21. At the time of the denial of benefits, Liberty Mutual failed to make further inquiry either with Dr. Weatherly, Dr. Hensarling, or an independent medical expert to establish that McKneely's fibromyalgia was not work-related and the payment for further treatment was unnecessary. The record is clear that at the time McKneely's benefits were denied both Dr. Weatherly and Dr. Hensarling thought additional investigation and treatment were needed.

¶22. This Court also notes that while the denial of benefits occurred in December of 1994, the deposition of Dr. Hensarling was not taken regarding the relationship of the diagnosis of fibromyalgia and McKneely's March 30, 1994, on-the-job injury until February 22, 1996. During his deposition, Dr. Hensarling espoused that he believed with a reasonable degree of medical probability that the March 30, 1994, work-related accident was the triggering factor for McKneely's fibromyalgia. Additionally, McKneely was treated by a second rheumatologist, Dr. Ann Meyers.

¶23. Liberty Mutual contends that their position for denying benefits was supported by Dr. Meyers's general assertion that the cause of fibromyalgia was unknown. However, we find that this assertion does not accurately represent Dr. Meyers's deposition testimony.

¶24. Dr. Meyers treated McKneely after Dr. Hensarling. Dr. Meyers stated that she agreed with Dr. Hensarling's diagnosis of fibromyalgia. Additionally, she testified that in McKneely's case she too felt there was a historical, causal relationship between his work-related injury and his fibromyalgia.

¶25. An investigation would have disclosed that more treatment was needed for McKneely, and that in McKneely's case time was of the essence with regards to whether the treatment would be effective. Instead, Liberty Mutual opted to discuss Dr. Weatherly's November 30, 1994, letter with their counsel which after reading the letter advised them that it could terminate benefits. Liberty Mutual gave no further consideration to the open-ended comments of Dr. Weatherly or his referral of McKneely to Dr. Hensarling.

¶26. While we acknowledge that a good faith reliance on advice of counsel may preclude the imposition of punitive damages it is not an absolute bar. *Henderson v. United States Fidelity & Guar. Co.*, 695 F.2d 109, 113 (5th Cir. 1983). "[I]t is simply not enough for the carrier to say it relied on advice of counsel, however unfounded, and then expect that valid claims for coverage can be denied with impunity pursuant to

such advice." *Szumigala*, 853 F.2d 274, 282 (5th Cir. 1988).

¶27. Liberty Mutual failed to promptly pursue clarification of such opened-ended statements as: "neck pain of unknown etiology, and inorganic problems may exist" as well as not giving weight to the fact that Dr. Weatherly's statements were qualified with "I," and that he had made a referral for further treatment of McKneely by Dr. Hensarling. Additionally, Liberty Mutual, without investigation, chose to deny treatment and a further work up by Dr. Hensarling.

¶28. At the trial of this matter, McKneely presented testimony from Ms. Annette Hitt who ran the pain clinic for one of McKneely's treating physicians, Dr. Ann Myers. The testimony of Ms. Hitt further revealed Liberty Mutual's general disregard for McKneely's and others rights. The testimony of Ms. Hitt established that she had spoken with Bill Paxman, the adjustor managing McKneely's case for Liberty Mutual on several occasions in an attempt to have treatment approved. Hitt claimed that Paxman denied payment on these occasions. Hitt explained that she remembered Paxman asserted that benefits were being denied once because they were going to get a second opinion and once because McKneely's workers' compensation claim was on appeal. Hitt noted that Paxman never asked for a report from Dr. Myers regarding the treatment of McKneely. Hitt also explained that while McKneely was undergoing extensive therapy she requested that Liberty Mutual approve payment of benefits to board McKneely. Liberty Mutual declined. As a result, McKneely traveled from Vicksburg to Jackson. On one occasion McKneely was involved in an accident when he ran off the road. This caused further injury and delayed treatment. Hitt also asserted that in her experience she found that Liberty Mutual was difficult and that they always met requests with a defensive position -- the patient is malingering. Additionally, Hitt could not recall an instance over the ten years that she had been working at the pain clinic that Liberty Mutual had ever responded affirmatively to a first request to approve services.

¶29. When this Court views the evidence in the light most favorable to the appellee (i.e., McKneely) there was sufficient evidence presented by McKneely regarding a malicious and wrongful denial of benefits by Liberty Mutual. We concede that the record discloses that in the eleventh hour Liberty Mutual finally began an investigation. However, this investigation was conducted too late to alleviate the previous breach of good faith by Liberty Mutual and its effects on McKneely. The record shows that McKneely suffered from depression and had to receive charity to support his family due to the hasty decision of Liberty Mutual.

¶30. The trial judge had the benefit of all this evidence, as well as observing the demeanor of the witnesses. We conclude that the trial judge did not err in its finding that "Liberty Mutual Insurance Company made a selfish financial decision and did not comply with the mandates of fairness and good faith in investigating McKneely's claim by refusing to follow up with psychiatric counseling and a work hardening program and also by not allowing a complete work up by Dr. Hensarling." With this in mind, we must now address the second tier and determine if it was necessary to allocate an award to deter the same future conduct by Liberty Mutual and others and whether the trial judge made a correct allocation of money.

¶31. "Under Mississippi bad-faith law, punitive damages are awarded not to recompense for loss due to a personal injury; rather, they are awarded to punish and deter - 'to make an example of the defendant' for a willful, reckless, or grossly negligent breach of insurance contract." *Estate of Wesson v. United States*, 843 F. Supp. 1119, 1122 (S. D. Miss. 1994).

¶32. In *Andrew Jackson Life Ins. Co. v. Williams*, 566 So. 2d 1172, 1190 (Miss. 1990), the Mississippi Supreme Court discussed four elements to guide the finder of fact in determining the total sum to award for

punitive damages. The elements are as follows: (1) the amount awarded should serve to punish the insurer and deter the same or similar conduct in the future, (2) the sum awarded should deter others from committing similar offenses, (3) the amount awarded should coincide with the insurer's economic ability and financial worth, and (4) the amount is to compensate the litigant for his/her "public service" by bringing the action. *Id.*

¶33. Evidence introduced revealed the Liberty Mutual's "net admitted assets" exceeded 19 billion dollars. This Court hopes that the amount awarded serves to deter this and similar conduct in the future by Liberty Mutual and others. Nevertheless, in light of the assets held by Liberty Mutual we do not find that the trial judge abused his discretion in awarding the total sum of $150,000 in compensatory damages and $200,000 in punitive damages. Additionally, the $200,000 amount awarded for punitive damages by the trial judge clearly coincided with Liberty Mutual's financial worth and economic ability to pay. Furthermore, we find that the trial judge did not abuse his discretion in determining that this sum afforded adequate compensation to McKneely for bringing the action. Therefore, we find the issues presented by Liberty Mutual are without merit. Accordingly, we affirm the decision of the trial judge.

¶34. **THE JUDGMENT OF THE CIRCUIT COURT OF WARREN COUNTY IS AFFIRMED. STATUTORY DAMAGES AND INTEREST ARE AWARDED. ALL COSTS OF THIS APPEAL ARE ASSESSED TO THE APPELLANT.**

**KING, P.J., PAYNE, BRIDGES, THOMAS, MYERS AND CHANDLER, JJ., CONCUR. MCMILLIN, C.J., DISSENTS WITH A SEPARATE WRITTEN OPINION JOINED BY SOUTHWICK, P.J., AND IRVING, J.**

McMILLIN, C.J., DISSENTING:

¶35. I dissent. The burden is on the claimant to establish his entitlement to any form of benefits payable under this State's workers' compensation laws. *Lanterman v. Roadway Exp., Inc.*, 608 So. 2d 1340, 1347 (Miss. 1992). This would necessarily include payments for temporary total disability during the worker's convalescence. Miss. Code Ann. § 71-3-17(b) (Rev. 2000). The majority appears to have adopted a rule that the claimant, by merely alleging a compensable injury, may require the carrier to pay temporary total disability benefits when the medical evidence as to causation is in conflict, or, more to the point in this case, when there is *no* medical evidence suggesting that the claimant is suffering from a work-related disability.

¶36. In the matter now before the Court, the carrier voluntarily paid temporary total disability payments to McKneely without any formal determination of compensability until the primary treating physician, Dr. Weatherly, advised the carrier that he could find no connection between McKneely's medical condition and an industrial accident at McKneely's employment. Dr. Weatherly did suggest the need for further treatment of McKneely's symptoms, but that does not establish that those symptoms could be traced to a workplace injury. To the contrary, Dr. Weatherly specifically voiced his opinion that McKneely's condition - diagnosed as fibromyalgia by Dr. Hensarling - had no relation to an industrial accident asserted to have occurred in March 1994.

¶37. Dr. Weatherly also suggested the possibility that McKneely's complaints might be psychosomatic rather than the consequence of a physical injury, but, in so doing, he gave no indication that the origins of this psychological condition were traceable to an event at McKneely's employment. There is no authority

for the notion that a carrier, upon learning that a claimant has no detectable physical symptoms consistent with a reported work-related injury, must nevertheless continue benefits while it explores whether the employee's complaints are traceable to a psychological condition that (a) may not exist, and (b) even if it does, shows no indication of having its origins in a job-related event. If the claimant's theory of compensability is based on an alleged psychological injury, it is the claimant's obligation to advance credible evidence to prove the claim by clear and convincing evidence. *Fought v. Stuart C. Irby Co.*, 523 So. 2d 314, 317 (Miss. 1988). It is not the carrier's duty to seize on a treating physician's unsupported speculation and assume both the existence of the psychological injury and its work-related nature until, by its own investigative efforts, it can affirmatively prove the contrary.

¶38. Even had the carrier sought out Dr. Hensarling and verified his opinion that McKneely suffered from fibromyalgia and that the condition had been caused or exacerbated by a work-related event, there is no basis to hold that the carrier was obligated to accept Dr. Hensarling's view of the case over Dr. Weatherly's contrary opinion. The proper forum to resolve such differences of opinion of the medical experts is before the Mississippi Workers' Compensation Commission. That is what ultimately occurred in this case and there is no contention that the carrier has wilfully refused to abide by the Commission's order, once the issue was decided.

¶39. When a carrier finds that it has relied upon medical evidence that is ultimately rejected by the Commission in favor of evidence more favorable to the claimant, the carrier is exposed to sanctions in the form of penalties for its "poor judgment." Miss. Code Ann. § 71-3-37(5) (Rev. 2000). Such sanctions were, in fact, imposed in this case for the unpaid temporary total disability payments ultimately ordered by the Commission. It is an entirely different thing, however, to say that reliance on competent medical evidence tending to show that the claimant is no longer suffering from a work-related disability can be an act of bad faith merely because another medical expert harbors a different view.

¶40. Finally, it must be noted that the workers' compensation statutes provided McKneely with an adequate remedy to timely address his dissatisfaction with the termination of his temporary total disability payments. Section 71-3-17(b) provides, in part, that

> if there arises a conflict in medical opinions of whether or not the claimant has reached maximum medical recovery and the claimant's benefits have [been] terminated by the carrier, then the claimant may demand an immediate hearing before the commission upon five (5) days' notice to the carrier for a determination by the commission of whether or not in fact the claimant has reached maximum recovery.

Miss. Code Ann. § 71-3-17(b) (Rev. 2000). The record shows, in fact, that within three days of the carrier's decision to terminate McKneely's temporary total disability benefits, his attorney filed a motion for just such a hearing and obtained a setting on the motion for February 13, 1995 - just over one month after the carrier's decision. However, on February 6, 1995, McKneely's attorney sought a continuance of that hearing based on a scheduling conflict. For reasons left unexplained in this record, there was no further attempt to pursue this remedy that, on its face, was entirely adequate to address McKneely's dissatisfaction with the carrier's decision to end his temporary total disability benefits.

¶41. The trial court based its award of substantial damages on a finding that McKneely "was financially destitute, living on charity and welfare from termination on December 20, 1994, until benefits were reinstated on April 9, 1997." Remarkably absent from the court's findings was any discussion of the fact

that, during that entire period, McKneely had a completely adequate remedy - which he commenced in early 1995 then inexplicably abandoned - to seek to have his temporary total disability payments reinstated, the only prerequisite being that he have sufficient proof to persuade the Commission of his entitlement to the benefits. That failure to pursue such a readily-available remedy for a perceived wrong is inexcusable and a sufficient basis, standing alone, to deny this bad faith claim.

¶42. I would reverse and render this judgment based on two separate theories, either of which is sufficient to defeat McKneely's bad faith claim. First, it is beyond dispute that the evidence was insufficient to support a finding of bad faith in the carrier's decision to terminate temporary total disability payments because there existed competent medical evidence that McKneely's complaints were not traceable to a work-related event. In fact, at the time the decision to end temporary total disability payments was made, there was *no* evidence before the carrier that McKneely's condition was traceable to an industrial accident. Alternatively, it is unconscionable that McKneely should be heard to complain about a temporary hiatus in his disability payments when he failed to avail himself of a readily available and entirely adequate statutory remedy to promptly resolve that grievance before the Workers' Compensation Commission immediately after his grievance arose.

**SOUTHWICK, P.J., AND IRVING, J., JOIN THIS SEPARATE WRITTEN OPINION.**